2025 PA Super 227

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA LEE HOLLABAUGH | : | |
| | : | |
| Appellant | : | No. 1356 MDA 2024 |

Appeal from the PCRA Order Entered August 22, 2024
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s): CP-31-CR-0000246-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA LEE HOLLABAUGH | : | |
| | : | |
| Appellant | : | No. 1357 MDA 2024 |

Appeal from the PCRA Order Entered August 22, 2024
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s): CP-31-CR-0000247-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA LEE HOLLABAUGH | : | |
| | : | |
| Appellant | : | No. 1358 MDA 2024 |

Appeal from the PCRA Order Entered August 22, 2024
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s): CP-31-CR-0000248-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |

|  |  |  |
|---|---|---|
|  | : |  |
| v. | : |  |
|  | : |  |
|  | : |  |
| JOSHUA L. HOLLABAUGH | : |  |
|  | : |  |
| Appellant | : | No. 1359 MDA 2024 |

Appeal from the PCRA Order Entered August 22, 2024
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s): CP-31-CR-0000249-2017

BEFORE: LAZARUS, P.J., BOWES, J., and LANE, J.

OPINION BY LAZARUS, P.J.: **FILED: OCTOBER 3, 2025**

Joshua Lee Hollabaugh appeals from the orders, entered in the Court of Common Pleas of Huntingdon County, denying his petitions for relief filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. We affirm.

The Commonwealth charged Hollabaugh with various sexual offenses committed against four separate minor females: T.S., K.S., E.S., and M.B.[1] The four victims were linked by the fact that Hollabaugh's parents babysat or otherwise supervised the girls.

K.S., who was sixteen years old at the time of trial, was the first to disclose the abuse to authorities. She testified that her mother married Hollabaugh's brother and the three lived at the Hollabaugh residence when

---

[1] Each of the four dockets corresponds to one of the victims. Additionally, Hollabaugh was born in December of 1984 and the earliest incident of abuse testified to by the victims occurred in roughly 2001, and the latest in 2009. Thus, Hollabaugh was between the ages of seventeen and twenty-five at the time of the offenses.

- 2 -

she was "five or six" years old. N.T. Trial, 8/28/18, at 32. K.S., her mother, and her mother's husband lived upstairs, along with Hollabaugh, who is deaf. K.S. testified that one day Hollabaugh signaled to her and two other girls, E.S. and H.N., that they should help clean his bedroom. Once inside the bedroom, Hollabaugh exposed himself. K.S. saw Hollabaugh grabbing H.N's hand and placing it on "his exposed area." *Id.* at 39. Hollabaugh then directed K.S. over, put her hand on his penis, and forced her to perform oral sex. She testified that she was "[a]round like six" when this occurred, estimating her age based on the fact she "was on a t-ball team [at that time], and you can only be on t-ball from five to seven." *Id*. She eventually disclosed the abuse to her mother, who then contacted the authorities.

Pennsylvania State Police Trooper Jonathan Thomas discovered the abuse of the other girls based on K.S.'s forensic interview and subsequent investigation. T.S., who was twenty-one years old at the time of trial, testified that she began visiting the residence when she was about four years old and ended when she was about sixteen. *Id*. at 81. She testified to "a few incidents" that she "remember[ed] just vaguely." *Id.* at 82. The first occurred when T.S. was "anywhere from ten to twelve," when Hollabaugh "tried to show [her] something on his computer." *Id.* As T.S. looked at the monitor, Hollabaugh "grabbed and fondled [her] breast." *Id.* On another occasion, when T.S. was approximately twelve years old, Hollabaugh again motioned to have her look at his computer. When she "went in to look, [she] asked" for "one of his cigarettes," and he agreed "as long as he could touch [her] breast."

*Id.* at 83. Hollabaugh then placed his hand under her shirt and squeezed her breast. *Id.*

Around the time T.S. was twelve or thirteen years old, Hollabaugh drove her to a convenience store and bought cigarettes. T.S. asked to have one, and he drove her to a cemetery. Once there, he wrote a text on his phone, saying "he would give [her] a cigarette if [she] put [her] mouth on his penis." *Id.* at 85. She agreed and did so. *Id.*

E.S., one of the two girls present in the bedroom for the incident involving K.S., was eighteen years old at the time of trial. She started going to the Hollabaugh's home around the age of four to five. She testified that about five kids would be there on any given day, and recalled seeing K.S., who "lived there for a little." *Id.* at 55. "[T.S.] was there a lot[,] too." *Id.* Regarding the bedroom incident, she testified that Hollabaugh "wrote something down," but, because the kids could not read yet, "he got his dick out – his penis – and he kept pointing to it and pointing at us." *Id.* at 57. He "pointed at the posted [sic] note that he wrote on." *Id.* at 58. Hollabaugh then forced E.S. to perform oral sex. *Id.* She testified that K.S. "was on the bed" and believed "[Hollabaugh] got on top of [K.S.] and he did have his penis out," but she "honestly [could not] remember" the details. *Id.* at 59. E.S. also recalled that H.N., her cousin, was in the room.[2]

---

[2] H.N. testified as a defense witness and stated Hollabaugh did not abuse her and that this incident did not occur.

M.B. was twenty-two years old at the time of trial and testified that her grandmother lived across the street from Hollabaugh's home.  She visited her grandmother during the summer and would often cross the street to play outside with the other children.  While she rarely went inside the Hollabaugh home, one day she "went inside to use the [upstairs] bathroom." ***Id.*** at 67. She passed Hollabaugh's bedroom, and he motioned her over.  He "started rubbing [her] leg" and eventually "forcefully grabb[ed her] vagina[.]" ***Id.*** at 68.  She believed that she was about seven years old at the time. ***Id.*** at 69.

Hollabaugh was convicted of various crimes and sentenced to an aggregate period of 26½ to 53 years of incarceration.  This Court affirmed Hollabaugh's judgment of sentence on direct appeal. ***See Commonwealth v. Hollabaugh***, 240 A.3d 182 (Pa. Super. 2020) (Table).  Hollabaugh filed identical timely PCRA petitions at each of the four dockets.  The PCRA court held an evidentiary hearing and denied relief.  Hollabaugh timely appealed[3] and he and the PCRA court complied with Rule 1925.  We *sua sponte*

---

[3]  Hollabaugh filed a separate notice of appeal at each docket listing all four criminal docket numbers.  Each notice is separately timestamped and has a checkmark next to the appropriate case.  This Court initially determined that, under ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2020), a notice of appeal is defective if it lists more than one docket number. ***See Commonwealth v. Creese***, 216 A.3d 1142 (Pa. Super. 2019).  We subsequently overruled ***Creese*** in ***Commonwealth v. Johnson***, 236 A.3d 1141 (Pa. Super. 2020) (*en banc*), where the appellant filed separate notices of appeal listing all docket numbers and italicized the relevant docket.  "The fact that each notice of appeal listed all four docket numbers does not invalidate his notices of appeal, and we decline to quash his appeals." ***Id.*** at 1148.  We therefore find that quashal is not warranted.

consolidated the appeals. *See* Pa.R.A.P. 513. Hollabaugh presents four issues for our review.

> I. Whether [t]rial [c]ounsel was ineffective for failing to present, let alone discuss, the prospect of presenting character witnesses at [t]rial?
>
> II. Whether [t]rial [c]ounsel was ineffective for failing to try and secure . . . case files from Huntingdon County Children's Services, which contained prior inconsistent statements and other exculpatory evidence that could have been used at [t]rial?
>
> III. Whether [t]rial [c]ounsel was ineffective in failing to adequately prepare for [t]rial with both []Hollabaugh and one or more [c]ertified [American Sign Language (ASL)] [i]nterpreters?
>
> IV. Whether [t]rial [c]ounsel was ineffective in failing to demand the use of a [c]ertified [d]eaf ASL [i]nterpreter [t]eam with one of the members being a truly [d]eaf [c]ertified ASL [i]nterpreter at [t]rial since []Hollabaugh is fully [d]eaf and was unable to understand or appreciate the testimony at [t]rial as the [t]rial proceeded in real time?

Appellant's Brief, at 4.

This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by evidence of record and is free of legal error. *Commonwealth v. Burkett*, 5 A.3d 1260, 1267 (Pa. Super. 2010) (citations omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." *Commonwealth v. Miranda*, 317 A.3d 1070, 1075 (Pa. Super. 2024) (citation omitted).

Each of Hollabaugh's claims challenges the stewardship of trial counsel, Lance Marshall, Esquire. Counsel is presumed effective and we "must indulge

a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption[.]" ***Strickland v. Washington***, 466 U.S. 668, 689 (1984). To do so, the petitioner must establish both deficient performance and prejudice, and the "[f]ailure to make the required showing of either . . . defeats the ineffectiveness claim." ***Id.*** at 700. Our Supreme Court has "refined the ***Strickland*** performance and prejudice test into a three-prong analysis." ***Commonwealth v. Spotz***, 84 A.3d 294, 311 (Pa. 2014) (citation omitted). The petitioner must plead and prove that: "(1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result." ***Id.*** "The failure to satisfy any one of these criteria is fatal to the claim. To establish prejudice in the context of this standard, a petitioner must establish that there is a reasonable probability that the result of the proceeding would have been different but for the complained-of conduct." ***Commonwealth v. Thomas***, 323 A.3d 611, 621 (Pa. 2024) (citations omitted).

In Hollabaugh's first claim, he challenges trial counsel's failure to call character witnesses. The bulk of his argument addresses the importance of such witnesses, especially in credibility battles like this one, and criticizes trial counsel's rationale for failing to investigate.

Hollabaugh is correct that character witnesses may be crucial in cases where the only evidence linking the defendant to the crime is an accuser's testimony. In ***Commonwealth v. Alceus***, 315 A.3d 853 (Pa. Super. 2024),

we reversed an order denying PCRA relief and ordered a new trial for counsel's failure to call character witnesses in a case where the victim and the defendant offered contradictory accounts. *Id.* at 868. "[T]his Court has long recognized, and more recently reaffirmed in non-precedential decisions, that in 'he said, she said' cases, trial counsel may be found to have provided ineffective assistance for failing to present character witnesses." *Id.* at 862–63. Trial counsel representing Alceus, like Attorney Marshall here, "admitted . . . that he never discussed the potential to call character witnesses" with his client. *Id.* at 858. We held that "trial counsel's failure to conduct any investigation into the availability of character witnesses" was not a reasonable strategic choice, as "there was no known bad character evidence for the Commonwealth to present" and the character testimony would bolster the strategy of showing the witnesses were lying. *Id.* at 865.

Hollabaugh primarily takes issue with the PCRA court's conclusion that Attorney Marshall articulated a sufficient basis for declining to present character witnesses. We agree that his testimony in that regard does not evidence a valid strategic basis.[4] The problem, however, is that Hollabaugh

_____

[4] Attorney Marshall testified that he made a conscious decision not to call character witnesses, explaining that he "went to church with Jerry Sandusky" and "everybody or at least the people in my circle" would have believed he was innocent, including himself. N.T. PCRA Hearing, 3/30/23, at 16. This was essentially his only explanation for rejecting character witnesses, and he conceded that he did not discuss the issue with Hollabaugh or investigate any potential character witnesses. *Id.* at 17. As in *Alceus*, we conclude that this was not a sufficient strategic basis since counsel failed to investigate *any* character witnesses.

must establish that his claim is of arguable merit and that he was prejudiced by counsel's failure to investigate, which required him to present the testimony of the character witnesses that, in his view, Attorney Marshall should have called. At the PCRA hearing, Hollabaugh did not present any witnesses to testify to their availability and willingness to serve as character witnesses. Hollabaugh testified that Kelly Parks "was a teacher that [he] had" and who he "learned a lot from in all subjects." N.T. PCRA Hearing, 5/1/23, at 57. "And then Iva Hinton was [his] interpreter" from elementary through high school. *Id.* He also identified Ben Grove, "a good friend" with whom he "did a lot of social things," as well as Ben's sister, Ashley. *Id.* After listing these individuals, PCRA counsel asked: "Do those individuals that you just identified, are those individuals that you believe could possibly have served as character witnesses for you at trial?" *Id.* at 57. Hollabaugh replied, "Yes." *Id.* at 58. On cross-examination, Hollabaugh conceded that he had not spoken to these witnesses.

> Q. You indicated that you had at least four character witnesses that you would call for trial?
>
> A. Yes.
>
> Q. Are any of those witnesses here today?
>
> A. No, they are not. They would need to be informed about coming to court.
>
> Q. And would it be fair to say you have no idea whether or not they would agree to be a character witness or what they would say about your character?
>
> A. Okay, can you say that again?

Q. Yes. You never spoke to them or your attorney never spoke to them about being a character witness?

A. No, no, I haven't.

Q. Including your PCRA counsel? . . . Do you know if he interviewed any of those witnesses?

A. No, I don't know.

Q. So[,] would it be fair to say even though you may want them as character witnesses, you have no idea what they would say?

A. That's correct. I wouldn't know.

*Id.* at 73.

Hollabaugh does not cite a case in which trial counsel was deemed ineffective for failing to call character witnesses whose willingness to testify is unknown.[5] He cites **Commonwealth v. Weiss**, 606 A.2d 439 (Pa. 1992), a case in which the appellant offered the testimony of several character witnesses, at a hearing his on post-verdict motion, to support of his claim that trial counsel was ineffective. *Id.* at 442. Because the witnesses testified, the case is distinguishable. He also cites **Commonwealth v. Hull**, 982 A.2d 1020 (Pa. Super. 2009), but that case focused on whether counsel articulated a

---

[5] Hollabaugh's brief alludes to the possibility that prejudice is presumed if trial counsel fails to have the client decide whether character witnesses should be presented. **See** Appellant's Brief, at 34 ("Trial counsel should have been deemed to be ineffective . . . in not discussing the subject of character witnesses, let alone failing to present character testimony at [t]rial and by failing to fully advise []Hollabaugh prior to [t]rial about the importance of obtaining character witnesses[.]"). He offers no citation for this proposition. "Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." **Robert Leroy Mccoy v. Louisiana**, 584 U.S. 414, 422 (2018). We do not agree that the choice to call character witnesses is exclusively left to the defendant.

sufficient reasonable basis for failing to call known character witnesses who spoke to counsel in advance of trial. **Id.** at 1022. There, the attorney "appeared to have a lack of understanding with regard to the importance of reputation testimony [and] appeared to be unaware that evidence of good character in and of itself could raise a reasonable doubt of the defendant's guilt[.]" **Id.** at 1025 (quoting PCRA court opinion). Additionally, the parties may have stipulated to what the witnesses would say at trial. **Id.** at 1022 ("It is not contested that there were available witnesses who were willing and able to testify as to [Hull]'s good character at trial."). There is no such agreement here.[6]

One decision cited by Hollabaugh somewhat supports his position. In **Commonwealth v. Luther**, 463 A.2d 1073 (Pa. Super. 1983), at the evidentiary hearing, "[Luther] produced the names of nine potential character witnesses who stated that they would have been willing to testify at his trial

_____

[6] Even if the Commonwealth had stipulated to the credibility of the proposed character witnesses, it is not clear that the PCRA court could lawfully accept the stipulation. **See Commonwealth v. Perrin**, 291 A.3d 337, 346 n.7 (Pa. 2023) ("We do not address the question of whether the trial court, in its discretion, may accept a proposed stipulation as to witness credibility[.]"); **id.** at 347 (Pa. 2023) (Dougherty, J., concurring) (opining that "purported stipulations to witness credibility are invalid *ab initio*"). Thus, the **Hull** decision may rest on shaky grounds.

Relatedly, it is not clear whether any such stipulation could bind the courts on appeal. **Cf. Commonwealth v. Brown**, 196 A.3d 130, 145 (Pa. 2018) ("In short, the PCRA requires judicial merits review favorable to the petitioner before any relief may be granted. A confession of error by the Commonwealth does not constitute a judicial ruling in Brown's favor, and thus is insufficient for any grant of relief under the PCRA.") (emphasis omitted).

- 11 -

and would be willing to testify on his behalf at a future trial." ***Id.*** at 1079 n.2. This footnote is the only reference to the issue. However, ***Luther*** was decided in 1983, before the Supreme Court issued its decision in ***Strickland***. Indeed, the word "prejudice" does not appear in the ***Luther*** opinion, and, after determining there was arguable merit to the ineffectiveness claim, we "proceed[ed] to a study of whether there was any reasonable basis for the failure of trial counsel to provide for the presentation of character testimony." ***Id.*** at 1078. We, therefore, presumed prejudice due to the absence of a reasonable strategic basis. That theory is incompatible with ***Strickland***. ***See Commonwealth v. Pierce***, 527 A.2d 973, 976 (Pa. 1987) ("[T]o the extent that [***Commonwealth ex rel. Washington v.***] ***Maroney***[, 235 A.2d 349 (Pa. 1967)] or [***Commonwealth v.***] ***Badger***[, 393 A.2d 642 (Pa. 1978)] have been interpreted to exclude prejudice from analysis of ineffectiveness claims, that language is expressly overruled."). ***Luther*** is therefore not controlling.

Finally, we add that our Supreme Court has stated that "one of the primary reasons PCRA hearings are held in the first place is so that credibility determinations can be made; otherwise, issues of material fact could be decided on pleadings and affidavits alone." ***Commonwealth v. Johnson***, 966 A.2d 523, 539 (Pa. 2009). By failing to present the witnesses who Attorney Marshall should have discovered, Hollabaugh has not established that this claim has arguable merit. ***See Commonwealth v. Connolly***, 689 A.2d 950, 952 (Pa. Super. 1997) ("In order to present an issue of arguable merit premised upon counsel's failure to call character witnesses, it must be

- 12 -

established that: . . . the witness was willing to testify on appellant's behalf at trial[.]").

Hollabaugh's second claim involves PCRA counsel's discovery of additional records regarding E.S. Hollabaugh obtained a subpoena for records from the Huntingdon County Children and Youth Services Agency, which were reviewed *in camera* by the trial court and then disclosed to Hollabaugh. Counsel then

> came upon a singular gem in the form of a prior inconsistent statement that would have bolstered, amplified, and fully supported [t]rial counsel's primary "theory of the case" and likely acquitted []Hollabaugh of some or all of the charges[,] since the time frame first given by . . . [E.S] was at a time and date when that person was not even being watched by the mother of []Hollabaugh.

Appellant's Brief, at 38.

Briefly, we note that the Commonwealth initially objected to any mention of the statement itself, arguing that it did not possess the relevant document and was unaware that the trial court had reviewed it. The Commonwealth explained that a Multiple Disciplinary Task (MDT) team meets "to have communication with stakeholders about moving forward with cases," and the prosecutor stated he would "shut that whole program down" if its records were subject to disclosure. N.T. PCRA Hearing, 5/1/23, at 52. Thus, it is unknown who authored the document. As the Commonwealth described it, "the report . . . is somebody's recollection of what somebody else interviewed that the child said, it's double, triple hearsay." *Id.* at 53. The PCRA court replied, "That's why I'm not admitting it." *Id.* Thus, we have only

- 13 -

the offer of proof made by PCRA counsel, who appeared to agree with the PCRA court's ruling that the statement itself was inadmissible, regarding the statement's content.[7] Hollabaugh described the document as follows: "There is a note MDT meeting date. It's either [5] or [3]/9/17. There's a whole [sic] punched through the top of the number. And under [`]team recommendations['] it states [`E.S.] gave oral sex to him/about ten years old.[']" ***Id.*** at 51.

Hollabaugh claims that this statement would have supported Attorney Marshall's defense of the charges involving E.S. and K.S where K.S. testified that she, E.S., and H.N. were all present in Hollabaugh's bedroom after he asked the three girls to help clean. Hollabaugh then forced her to perform oral sex. According to K.S.'s trial testimony, this occurred when she was approximately six years old. E.S. testified to this same incident, relating that this event occurred when she was between the ages of four and five. E.S. is, however, about two-and-one-half years older than K.S., making K.S. a little over two years old in E.S.'s account. Attorney Marshall argued that it was impossible for both witnesses to be telling the truth, as E.S. did not begin visiting the Hollabaugh residence until she was at least four.

As with the character witness issue, Hollabaugh dedicates the bulk of his briefing on this point to the importance of investigating sources of potential

---

[7] The PCRA hearing took place over two days. At the first hearing, Attorney Marshall testified that he was unaware of the statement and the PCRA court sustained the Commonwealth's objections when Hollabaugh asked Attorney Marshall about this document.

impeachment material. However, as Hollabaugh does not develop any argument that this note would have been admissible, its only value would be in cross-examining E.S. *See* Appellant's Brief, at 38 ("At a minimum, [E.S.] could and should have been asked by [t]rial counsel about her prior inconsistent statement that she was [t]en . . . when the incident allegedly happened as contained within the CYS records[.]").

Hollabaugh's argument that this note was a "gem" severely overstates its evidentiary value. Its authenticity was not established and it is not clear if the unnamed MDT team member ever spoke to E.S. or if E.S. was in the room. Because multiple victims were involved, it could just as easily be the case that the author mixed up names and ages.

Because it is unclear if E.S. ever made the statement, we conclude that the claim lacks arguable merit. "An inconsistent statement can also be admissible to impeach a witness' credibility. However, it must be established that the witness, in fact, made the allegedly inconsistent statement." *Commonwealth v. Woods*, 710 A.2d 626, 630 (Pa. Super. 1998). Thus, "a summary of a witness' statement cannot be used for impeachment purposes absent adoption of the statement by the witness as his/her own." *Id.* While it is theoretically possible that E.S. could have adopted the statement if cross-examined, we conclude that is far too speculative to support this ineffectiveness claim. *See Commonwealth v. Urwin*, 219 A.3d 167, 172–73 (Pa. Super. 2019) ("Arguable merit exists when the factual statements are accurate and could establish cause for relief. Whether the facts rise to the

- 15 -

level of arguable merit is a legal determination.") (citation omitted). Under these facts, we find no arguable merit as a legal matter. Accordingly, this claim cannot merit relief.

Hollabaugh's remaining two claims both concern the use of ASL interpreters to communicate with Hollabaugh. The third claim alleges ineffectiveness based on trial counsel's failure to use a certified ASL interpreter when meeting with Hollabaugh to prepare for trial and his testimony. The fourth claim similarly alleges that trial counsel ineffectively failed to use "consecutive interpretation" at trial as opposed to the "simultaneous interpretation" method employed. Hollabaugh argues these issues together. *See* Appellant's Brief, at 46 ("The final . . . [i]ssues that are being raised in this [a]ppeal go together like 'ham and eggs' in that [t]rial counsel's unfamiliarity with the latter subject negatively impacted his handling of the former situation in terms of how he attempted to prepare for [t]rial.").

The following facts are relevant to these claims. At trial, three ASL interpreters assisted Hollabaugh and Attorney Marshall. One acted as a "table interpreter," sitting at the defense table with Hollabaugh and Attorney Marshall and facilitating communications between them. This same interpreter participated in pre-trial meetings between Attorney Marshall and Hollabaugh. The other two interpreters took turns interpreting what was said during the trial.

At the PCRA hearing, Hollabaugh called William H. Lockard, who was accepted as an expert witness in the field of deaf interpretation processes.

Lockard had over forty years of experience in interpreting sign language and aiding the deaf community. Lockard met Hollabaugh through his work with the Department of Corrections, which had asked Lockard to survey the state correctional facilities to assess how deaf inmates access services. Lockard testified that all interpreters at Hollabaugh's trial were able to hear and used "simultaneous interpretation," where the ASL interpreter signs for the deaf defendant in real time. The "consecutive interpretation" procedure, in contrast, has the hearing interpreter wait for the speaker to finish. The hearing interpreter then signs to the deaf interpreter, who then signs to the deaf individual. Lockard testified that this process increases accuracy.

Hollabaugh argued that this process was superior to the "simultaneous interpretation" method used at his trial and trial counsel was ineffective for failing to use it. As it relates to the third issue, Attorney Marshall testified at the PCRA hearing that he was frustrated with Hollabaugh's testimony. He specifically cited Hollabaugh's testimony about T.S. Hollabaugh testified he would occasionally speak with her after she got off the school bus. Unprompted, Hollabaugh explained that "[T.S.] had socks that she would stuff in her bra and walk around like that, showing off and being silly and playing games and picking and teasing other people[.]" N.T. Jury Trial, 8/28/18, at 182. He noticed these behaviors because he viewed it "as disrespectful and not appropriate." *Id.* He "would try to tell her how inappropriate that was; that I thought it was bad behavior[.]" *Id.* Hollabaugh later returned to the topic, saying "[T.S.] would . . . us[e] socks to look like she had fake breasts

to walk around and tease and pick on other people." *Id.* at 183. He "tried to explain" to her the behavior was inappropriate and speculated that she did not understand what he was saying. *Id.* Attorney Marshall explained that "he would have said . . . [']don't talk about that,[']" and recalled speaking about this issue during preparation. N.T. PCRA Hearing, 3/30/23, at 19. Hollabaugh now argues that better preparation with a deaf interpreter would have lessened the chances Hollabaugh would have given those answers. The fourth claim similarly maintains that the "consecutive interpretation" procedure should have been used at trial to improve accuracy.

We conclude that Hollabaugh has failed to establish prejudice. We briefly address the PCRA court's opinion, which noted the absence of a case involving this precise issue in Pennsylvania. The PCRA court approvingly cited a non-binding Texas Criminal Court of Appeals decision in *Linton v. State*, 275 S.W.3d 493 (Tex. Crim. App. 2009), which reversed an intermediate appellate decision "which had held, in essence, that the trial court reversibly erred in not providing the 'best' interpretive services—including a deaf-relay interpreter—to ensure appellant's full understanding of the trial proceedings." *Id.* at 495. In that case, counsel representing a deaf defendant argued during trial that a deaf interpreter should be appointed. The trial court denied the request and Linton received a new trial from the intermediate appellate panel. The Criminal Court of Appeals then reversed, concluding that the relevant legal test is grounded in due process. "The Constitution requires that a defendant sufficiently understand the proceedings against him such that he is

able to assist in his own defense." *Id.* at 504. The panel concluded that this standard was met under the facts in *Linton*.

The PCRA court concluded that this was the proper legal test, and that Hollabaugh "has not shown that the issues he had in communicating with Attorney Marshall and the [c]ourt, and in testifying before the jury, were so great that they prevented him from understanding the nature and objective of the proceedings against him and assisting meaningfully in his own defense." PCRA Court Opinion, 11/18/24, at 17-18. The PCRA court opined that any issues Hollabaugh experienced during trial were "a function of his education level and lack of knowledge of the legal system." *Id.* at 18.

Hollabaugh does not meaningfully address the foregoing analysis except to say that "[*Linton*] involved a [m]isdemeanor DUI charge[,] while the present matter involved multiple ancient child sex offenses[,] so there really was a heightened need for increased accommodations" to ensure a fair trial. Appellant's Brief, at 52.

We agree with the PCRA court that the *Linton* holding is highly persuasive in its analysis of the underlying legal issue. Yet we need not apply the case because the issue in *Linton* arose on direct appeal, not as a collateral ineffectiveness claim. *See Commonwealth v. Gribble*, 863 A.2d 455, 472 (Pa. 2004) ("[A]s a general and practical matter, the fact that a claim is litigated through the lens of counsel ineffectiveness, rather than as a preserved claim of trial court error, makes it more difficult for the defendant to prevail."). The United States Supreme Court explained in *Weaver v.*

*Massachusetts*, 582 U.S. 286 (2017), why different considerations apply at different stages of the process:

> Furthermore, when state or federal courts adjudicate errors objected to during trial and then raised on direct review, the systemic costs of remedying the error are diminished to some extent. That is because, if a new trial is ordered on direct review, there may be a reasonable chance that not too much time will have elapsed for witness memories still to be accurate and physical evidence not to be lost. There are also advantages of direct judicial supervision. Reviewing courts, in the regular course of the appellate process, can give instruction to the trial courts in a familiar context that allows for elaboration of the relevant principles based on review of an adequate record.

*Id.* at 302.

Thus, the test on direct appeal is not necessarily the same as on collateral appeal. Hollabaugh must establish how the lack of his preferred procedure prejudiced him under *Strickland*.

In an apparent attempt to avoid that requirement, Hollabaugh cites *Commonwealth v. Diaz*, 226 A.3d 995 (Pa. 2020), wherein our Supreme Court applied the doctrine of presumed prejudice due to counsel's failure to secure an interpreter for portions of the trial. *Id.* at 1005. "The PCRA court found that[,] in the absence of an interpreter, Diaz could not understand anything that occurred during *voir dire* or opening statements or much of the potentially outcome[-]determinative testimony of the complaining witness." *Id.* at 1010–11. Due to his inability to understand, Diaz "could not have communicated with his attorney about the substance of the proceedings." *Id.* at 1011. Pursuant to *United States v. Cronic*, 466 U.S. 648 (1984), there

are "certain, limited circumstances where prejudice is so likely that the cost of litigating the question of prejudice is unnecessary." ***Diaz***, 226 A.3d at 1008 (citing ***Cronic***, 466 U.S. at 658). The ***Diaz*** Court determined that the inability to communicate with counsel was effectively a total denial of counsel at a critical stage and warranted application of ***Cronic***.

The facts of this case are nothing like those in ***Diaz***, as Hollabaugh and Attorney Marshall were, at all times, able to communicate through interpreters. We decline to extend presumptive prejudice to this scenario, and Hollabaugh must show how the failure to use "consecutive interpretation" was prejudicial. Accepting, *arguendo*, that this claim is of arguable merit and that no strategic basis existed, Hollabaugh has failed to carry his burden to show prejudice. He merely alleges, in boilerplate fashion, that "the result of the proceeding would have been different had these additional protections and prophylactic measures been pursued and used at [t]rial or in his [t]rial preparation[.]" Appellant's Brief, at 53. He does not explain why that is so, and these speculative assertions do not meet his burden to prove that counsel was ineffective. ***Commonwealth v. Paddy***, 15 A.3d 431, 443 (Pa. 2011) ("We stress that boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective."). The third and fourth claims, therefore, do not merit relief.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 10/03/2025